# IN THE COURT OF APPEALS OF IOWA

No. 19-0153
Filed June 19, 2019

**IN THE INTEREST OF T.F.-M., T.M., G.M., and A.G.,**
**Minor Children,**

**F.F., Intervenor,**
     Appellant.

_____

Appeal from the Iowa District Court for Polk County, Rachael E. Seymour, District Associate Judge.

A paternal grandmother appeals the juvenile court's order denying her motion to intervene in pending child-welfare cases. **AFFIRMED.**

Magdalena Reese of Cooper, Goedicke, Reimer & Reese, P.C., West Des Moines, (until withdrawal) and Ronald E. Langford of Langford Law Office, LLC, Des Moines, for appellant intervenor.

Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee State.

Nicole Garbis Nolan of Youth Law Center, Des Moines, guardian ad litem for minor children.

Karl Wolle of the Des Moines Juvenile Public Defender, Des Moines, attorney for minor child A.G.

Considered by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**TABOR, Judge.**

A grandmother, Frances, challenges the juvenile court's order denying her motion to intervene in the child-welfare cases involving four children: T.F-M, T.M., G.M., and A.G.[1] Although Frances loves these children, her efforts to provide them a home came long after their removal from parental custody. In addition, the guardian ad litem (GAL) questioned Frances's capacity to protect the children given her unwillingness to accept that her son, Brian, was responsible for the death of another child and posed a risk of sexually abusing children. In light of these facts, we find no error in the juvenile court's denial of the motion to intervene.

**I.     Facts and Prior Proceedings**

The grandmother's delay in seeking intervention concerned the juvenile court. Indeed, it has been two years since the Iowa Department of Human Services (DHS) opened child-in-need-of-assistance (CINA) cases for A.G., G.M., and T.M. in June 2017 because of their parents' ongoing struggles with substance-abuse and mental-health issues. The CINA disposition occurred in September 2017. The DHS removed the youngest child, T.F.-M., from the parents' custody in February 2018, two days after her birth.

One month later, the DHS launched its search for kinship placements, sending out notices to relatives, including Frances. Frances did not respond. In June 2018, the children's mother, Sadie, expressed concern the DHS had not contacted the grandmother. Sadie also told the DHS that she and Brian considered "signing over guardianship" to Frances. The DHS worker verified

---

[1] Only three of the children are her son's biological offspring. A.G. has the same mother but a different father than the other three children.

Frances had received notice of the children's removal; Frances decided not to get involved because "Brian wanted to handle this situation as a man." Frances conveyed a willingness to be a placement for her biological grandchildren, but not for A.G. because of the child's behavioral challenges.

In assessing whether the grandmother would be a viable placement option, the DHS worker explored Frances's view of the family dynamics. Frances reported in the past Brian had been "a really good dad" and she could not believe "he would hurt the kids." Despite Brian's conviction for manslaughter in connection with the October 2000 shaken-baby death of his two-month-old child, Frances insisted, "Brian did not hurt that baby." Frances also described Brian's founded child-abuse investigation as the child's mother "getting even with Brian," and refused to believe Brian might be selling drugs to pay for the family's living expenses.

The case moved forward without much progress toward reunification by the parents. The DHS placed T.F-M, T.M., and G.M. in foster homes where they became integrated into those families.[2] In July 2018, the State petitioned to terminate parental rights. That same month, Frances, without an attorney, asked the court to consider her as a "good candidate" for care of the children. The court held an initial hearing on the grandmother's request in August 2018.[3] Without reaching a decision, the court assured Frances "even the parties [who] have indicated they don't believe that you should be granted the request don't dispute

---

[2] Since birth, T.F.-M. lived in foster care with one of his siblings. The DHS placed the oldest child, A.G., in shelter care but had an open foster-care referral at the time of the intervention hearing.

[3] Changing her earlier position, Frances told the court she was willing to care for all four children, including A.G., who was not her biological grandchild, recognizing the nine-year-old had "been through a lot" and was "part of us."

that you love the kids and that you want a relationship and that you are well intended so [the] court will consider your motion submitted."

The juvenile court then held termination hearings in August and September 2018. After those hearings, in early November 2018, Frances—with the assistance of counsel—filed a motion to intervene.[4] Before turning its attention to the intervention question, the court issued its ruling terminating parental rights in late November 2018.[5] About one week later, the court held a hearing on the grandmother's motion to intervene. The court denied the motion in early January 2019. Frances now appeals.

## II. Scope and Standards of Review

In most child-welfare appeals, our review is de novo—looking at the facts and law anew. *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). But we review the juvenile court's denial of a motion to intervene only for the correction of legal error. *In re H.N.B.*, 619 N.W.2d 340, 342–43 (Iowa 2000). Although our review is on error, we accord discretion to the juvenile court's determination whether the person seeking to intervene is "interested" in the matter being litigated. *Id.* As always, our fundamental concern is the best interests of the children. *J.C.*, 857 N.W.2d at 500.

## III. Analysis

Intervention is governed by Iowa Rule of Civil Procedure 1.407. While not all rules of civil procedure automatically apply in child-welfare proceedings, Iowa

---

[4] Sadie and Brian joined in Frances's motion.
[5] In March 2019, we issued two decisions affirming the termination of Brian's parental relationship with his three biological children. *In re T.M.*, No. 18-2137, 2019 WL 1055683, at *2 (Iowa Ct. App. Mar. 6, 2019); *In re A.G., G.M., and T.M.*, 18-2130, 2019 WL 1055876, at *2 (Iowa Ct. App. Mar. 6, 2019).

courts have used the intervention rule to decide motions by individuals "interested" in the subject matter of cases under Iowa Code chapter 232. *See, e.g.*, *H.B.N.*, 619 N.W.2d at 343 (noting "we are to liberally construe the rule of intervention" but "must be certain that the applicant has asserted a legal right or liability that will be directly affected by the litigation").

Here, Frances expressed a general desire to intervene in the open child-welfare cases. Because Iowa Code section 232.102(1)(a) extends relatives a "legal right" to be considered for custody in the dispositional phase of a CINA proceeding, a grandparent has an interest in the outcome of the dispositional hearing and, thus, a right to intervene. *In re A.G.*, 558 N.W.2d 400, 404 (Iowa 1997). But when the motion to intervene is filed long after the dispositional hearing, the interest in the outcome of that hearing no longer exists. *In re J.J.*, No. 10-0999, 2010 WL 3157770, at *3 (Iowa Ct. App. Aug. 11, 2010). Frances filed her motion to intervene more than one year after the disposition order in the CINA cases. Given its belated nature, the juvenile court properly determined the grandmother's motion to intervene in the CINA matters was untimely.

We next consider the grandmother's right to intervene in the termination proceedings under Iowa Code section 232.117(3).[6] She filed her motion after the termination hearing but before the court issued its order. For the open question of ongoing placement, her motion was timely. *See In re C.L.C.*, 479 N.W.2d 340,

---

[6] That provision directs the juvenile court, after termination, to transfer guardianship and custody of the children to one of the following: (1) the DHS, (2) a child-placing agency, or (3) a non-custodial parent, other relative, or other suitable person. Iowa Code § 232.117(3)(a)–(c).

344 (Iowa Ct. App. 1991) (holding petition to intervene after termination of parental rights was timely because questions of guardianship and custody remained).

In addition to timeliness, we address the separate question whether Frances had a right to intervene in the case involving A.G., given that the child was not her biological granddaughter. The State argued at the intervention hearing that Frances "did not have a legal interest because she was not a relative." But to the extent Frances was a "suitable person" under section 232.117(3)(c), she had a legal right to be considered as guardian or custodian of the child following the termination of the parental rights, even if she was not a blood relative.[7] *Id.* at 343 (finding couple had an interest in intervening because they had "functioned as the children's 'de facto psychological parents'").

Addressing the overall merits of the grandmother's motion, the juvenile court identified Frances's "primary reason for requesting intervention" was so she could be considered as a placement option for the children. The court denied intervention because the DHS spent "considerable time vetting relative placement options for these children, including [Frances]" and, based on its investigation, the DHS determined she was "not an appropriate placement for these children." The

---

[7] Some states have added the definition of "fictive kin" to their child-welfare statutes. *See, e.g.*, Fla. Stat. Ann. § 39.4015 (2018) ("'Fictive kin' means an individual who is unrelated to the child by either birth or marriage, but has such a close emotional relationship with the child that he or she may be considered part of the family."); Ga. Code Ann. § 20-1-15 (2017) ("'Fictive kin' means an individual who is known to a child as a relative but is not in fact related by blood or marriage to such child and with whom such child has resided or had significant contact."); Nev. Rev. Stat. Ann. § 424.090 (2017) ("'fictive kin' means a person who is not related by blood to a child but has a significant emotional and positive relationship with the child").

court noted the children's GAL agreed with the DHS assessment Frances would not be a suitable caretaker.[8]

To justify denying the grandmother's intervention request, the juvenile court listed four reasons: (1) her criminal record, (2) the inadequate space in her home for the children, (3) her refusal to believe her son Brian was responsible for the death of an infant and inappropriate sexual activity with another child,[9] and (4) the DHS's reluctance to disrupt the existing foster-care placements of the children that showed promise for long-term stability through adoption. As we examine the third and fourth reasons, we find no error in the juvenile court's denial of Frances's intervention request.

Intervention must be "compatible" with the children's best interests. *H.N.B.*, 619 N.W.2d at 344. We will not "elevate the grandparent['s] interests above . . . the interests of the child." *Id.* In this case, the best interests of the four children preclude placement with Frances because of unresolved doubts about her ability to shield them from harm, particularly given her son's history of troubling behavior. The juvenile court aptly summarized this concern:

> [Frances] does not believe [Brian] was responsible for the death of his child D.M. [Brian] was charged with a criminal act regarding the child's death and spent time in prison after his conviction to a less serious offense. Further, she similarly does not believe [Brian] engaged in inappropriate sexual activity with a minor, despite a

---

[8] The GAL told the court her "biggest concern" was the family's belief Brian did not pose any risk to the children: "They believe he took the rap for the death of his child for the baby's mother. They don't believe that he is a sex-offending risk and that's the biggest barrier to me. They can't be protective if they don't understand the dangers that he poses." A.G. had a separate GAL, who believed it was in that child's best interests to grant the motion to intervene. A.G.'s GAL told the court the nine year old considered Frances to be her grandmother and wanted to be with her rather than in shelter care.

[9] The juvenile court acknowledged Frances's convictions (for assault and driving while barred) were "dated" (having occurred twenty years earlier) but opined her criminal record "may be significant enough to bar adoption."

founded Child Protective Assessment. She also states she was unaware of [Brian] having any substance[-]abuse issues. The [c]ourt must rely on . . . caretakers to exercise appropriate [judgment] when determining who is safe for children to be around. The [c]ourt finds [Frances's] inability or unwillingness to acknowledge these issues directly impacts her ability to act in an appropriate protective capacity on the children's behalf.

Although the record shows Frances loves the children, her inclination to ignore her son's faults leaves too much uncertainty about their future safety. Under these circumstances, Frances did not have a sufficient interest in the section 232.117(3) proceedings to intervene. *See H.N.B.*, 619 N.W.2d at 345 (finding potential intervenors who were not suitable caretakers did not have a legal right directly affected by the litigation).

Finally, we share the juvenile court's reluctance to disturb the children's long-term placements in preadoptive homes. For young children removed from their parent's custody, time marches swiftly. Frances chose not to intervene earlier, deferring to her son's desire to handle the removal on his own. But her choice left three of the children in foster homes, where they are now comfortable and integrated into those families. "When a court terminates parental rights, there is no statutory preference for placement with a relative." *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018). In addition, the grandmother's belated request to intervene does not trump the value in maintaining a stable environment for the children. Frances's intervention at this late stage was not in the children's best interests.

**AFFIRMED.**